LANDRIEU, Judge.
The Orleans Parish School Board (hereinafter “the School Board”) appeals a judgment awarding to student Alvin Hickingbottom (hereinafter “Alvin”) $60,000.00 in damages for an injury allegedly inflicted by another student on the school grounds, after dismissal. At issue is whether the School Board, acting through the faculty of the Paul Lawrence Dunbar School (hereinafter “Dunbar”), exercised reasonable supervision of its students during after-school hours in this case. Since we conclude that it did, the decision of the trial court is reversed.
FACTS:
On November 19, 1987, Alvin, a fourth grade student at Dunbar, injured the little finger of his dominant hand in an altercation with sixth grader, Koray Gilbert (incorrectly named “Corey” in plaintiffs petition). The altercation occurred on the school grounds approximately ten minutes after classes had been dismissed for the day.
The procedure for dismissal and after-school care at Dunbar was undisputed. School principal Alexander Brumfield testified that the standard dismissal procedure was for teachers to walk their classes outside the building at the end of the school day. Three teáchers were stationed outside the school following dismissal to see that the children safely crossed the street. Students were not supposed to return to the school building following dismissal. If small children lingered in the school yard, Brumfield or his secretary would take them to the office and attempt to contact their parents. According to Brumfield, “Generally, for our school, within about a ten to twelve minute time, ninety percent of our children are on the way home.” In response to the Court’s questioning as to whether there was playing around on the school yard after school was finished, Brumfield stated, “There is no afternoon play period and we discourage that. We try to get [the students] home or at least started on the way home as quickly as possible.”
Brumfield’s testimony as to standard dismissal procedures was reiterated by school teacher Norma Kocotas and by Hickingbot-tom’s teacher at the time of the incident, Anna Sylvester. Sylvester testified that she dismissed her class at the sidewalk in accordance with standard dismissal procedure. Contradicting Alvin’s assertion, both Brum- *1365 field and Kocotas denied seeing children in the cafeteria.
Although there is no dispute that a confrontation occurred between the two boys on the date and time in question, there is a significant difference between each boy’s version of the incident. Alvin testified as follows:
It was 3:00 o’clock and I had left out the gate and went to the car and put my books up and I went to get my sister and I was in the cafeteria waiting and he [Koray] came over and he was pushing on me and I was walking out and I ran out the door and he ran behind me pushing me. He threw me on the ground and was stepping on my hand.
Koray testified that he had stayed after school to help his teacher clean the blackboard. Denying that the incident began in the cafeteria, Koray described it as follows:
I was coming out the classroom and when I walked down the stairs I got in the breezeway and I was walking and Alvin had hit me in the back of my head and ran. Then when I was running behind him he ran and he fell by the tree and I had punched him in the chest one time and then I was walking away and I seen Miss Kocotas coming toward me and she had brought us to the office.
Koray claimed that everything Hickingbot-tom said about him was a lie, and he repeatedly denied stepping on Hickingbottom’s hand. Koray also stated that he did not often get in fights, a claim which was corroborated by the school principal, Alexander Brumfield. At the conclusion of the testimony, the trial judge acknowledged in open court that he could not “[r]esolve which one [of the boys] is telling the truth.”
Although Miss Kocotas testified at trial that she had no recollection of the incident, the boys agreed that she escorted them to the office. There, Lee Harris,[1] who had come to school to pick up Alvin and who had sent him back onto the school grounds after dismissal to locate his younger sister, found the injured child. After being identified by Alvin’s younger sister and providing his name and address to the school secretary, Mr. Harris was allowed to withdraw Alvin from school. Since he was neither the child’s parent nor legal guardian, Mr. Harris was unable to obtain medical treatment for him. Consequently, he picked up the child’s mother, Mary Hickingbottom, and delivered Alvin and his mother to Charity Hospital for treatment.
Medical records from Charity Hospital indicate that Alvin was seen for trauma to his fifth finger. According to the medical history given, the child had been assaulted at school, held to the ground, and stepped on repetitively. The physical findings indicated tenderness over the entire right fifth digit and decreased ability to flex. No obvious swelling or erythema was noted. When the area was x-rayed, the radiologist found no abnormality either in the soft tissue or in the bony structure of the finger. Alvin was sent home with his mother, and the only suggested treatment involved the application of ice and the elevation of the finger.
Alvin testified that he suffered a great deal of pain for about a month following the accident, that the pain had been off and on thereafter, and that he could no longer bend his little finger very much. His mother corroborated his testimony as to pain, and stated that the pain worsened in cold weather.
At the conclusion of trial, the judge ordered that Alvin’s finger be re-evaluated by an orthopedist, while the case was kept open. Alvin was examined by Dr. James T. Bennett, who, in a report dated January 23,1992, assessed the condition as follows: “In summary, he is limited in his ability to flex at the DIP joint.... This represents no significant functional disability and would represent a small permanent partial disability....” In a letter dated the same day, Dr. Bennett stated, “In the absence of any other deformities [in addition to the inability to flex at the DIP joint] this means that when he makes a fist instead of the fingers all coming into his palm the little finger will stay out a little bit. *1366 He could be an orthopaedic surgeon, he could do heavy labor.”
Alleging that Koray assaulted Alvin and caused “severe and disabling injuries to his hand and fingers,” Mary M. Hiekingbottom had brought suit individually and on behalf of her minor child. As defendants in the suit, she named the School Board, school principal Alexander Brumfield, and Koray’s mother, Juanita Gilbert.
Trial was held May 24, 1990. Sitting as trier of fact, the trial judge heard testimony from eight witnesses, including Alvin and Koray. On the motion of her attorney, Juanita Gilbert, Koray’s mother, was dismissed at the conclusion of the testimony. On July 31, 1992, some six months after the requested orthopedic evaluation but over two years after the trial, the trial court found the School Board liable to the plaintiffs because of its negligence and awarded $60,000.00 in damages. No portion of fault was apportioned to the school principal, the remaining defendant, or to Alvin himself.[2] In reasons for judgment, the trial court noted that Alvin’s finger was painful and “unsightly.” Arguing that the trial court erred in finding that the faculty of Dunbar School failed to exercise a reasonable degree of supervision, the School Board brought this appeal.
DISCUSSION:
A school board is not the insurer of the safety of school children. Patterson v. Orleans Parish School Board, 461 So.2d 386, 387 (La.App. 4th Cir.1984). However, liability will be imposed upon a school board when there is a causal connection between a lack of supervision and an accident which could have been avoided by the exercise of a reasonable degree of supervision. Doe v. City of New Orleans, 577 So.2d 1024, 1025 (La.App. 4th Cir.1991). A school board has a duty to provide reasonable supervision commensurate with the age of the children and the attendant circumstances. Sutton v. Duplessis, 584 So.2d 362, 366 (La.App. 4th Cir.1991). In Laneheart v. Orleans Parish School Bd., 524 So.2d 138, 140 (La.App. 4th Cir.1988), we set forth the following analysis of a school board’s duty of supervision during after-school hours:
While there is generally no duty to supervise the school grounds after school hours or during the summer {Ulm v. Gitz, 286 So.2d 720 (La.App. 4th Cir.1973), writ denied 290 So.2d 332 (La.1974)), the school must provide supervision for children who are waiting on the grounds for the school bus (Nash v. Rapides Parish School Board, 188 So.2d 508 (La.App. 3d Cir. 1966)), or .participating in an after hours activity sanctioned by the school (Augustus v. Joseph A. Craig Elementary School, 459 So.2d 665 (La.App. 4th Cir.1984)).
A court of appeal may not set aside the trier of fact’s finding unless it is manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). When testimony conflicts, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Although a trial court’s factual findings are accorded great discretion, in the instant case there is nothing in the record which supports the factual finding upon which the trial court based its conclusion that the school board failed to exercise reasonable supervision.
In its reasons for judgment, the trial court stated, “[Alvin] was able to gain access to the cafeteria in which numerous children were being housed for after school care. This court is of the opinion that there was inadequate supervision available for the number of students in the cafeteria.” (emphasis added) The only evidence as to the presence of students in the cafeteria appears in the following testimony by Alvin:
Counsel: Was anybody else in the cafeteria other than you?
Alvin: Yes.
Counsel: Who else was in the cafeteria?
Alvin: Some girls.
*1367 Counsel: What were they doing?
Alvin: Jumping rope.
[[Image here]]
Counsel: Was a teacher there?
Alvin: No.
[[Image here]]
Counsel: Did these people that jumped rope, did they go to the cafeteria often?
Alvin: I don’t really know.
Nothing in this testimony, or elsewhere in the record, supports the trial court’s conclusion that “numerous children were being housed for after school care.” Furthermore, the trial court’s finding is directly contradicted by testimony from school faculty that there were no children in the cafeteria, and that their presence there would not have conformed with after school policy. In addition to offering nothing which would show that the school sanctioned the presence of children in the cafeteria following dismissal, Hickingbottom’s own version of the incident shows that the school safely delivered Hickingbottom into the care of his “step-father,” Lee Harris, prior to the altercation.
As mentioned above, the school board has a duty to provide reasonable supervision, commensurate with the age of the children and the attendant circumstances. While it is foreseeable that parents will occasionally send children back into the school building unsupervised, it would be unreasonable and unworkable to require a school to immediately intercept such children. Although the school did not conduct a systematic surveillance of the entire school building and its grounds during the period following dismissal, there were three teachers posted outside the building. Furthermore, both Alvin and Koray testified that they were sent to the office by a teacher immediately following the incident. Her prompt appearance on the scene indicates that there were teachers in the vicinity despite the absence of a teacher specifically on duty.
The school board has shown a standard dismissal procedure, and offered uncontra-dicted testimony that this procedure was followed by Alvin’s teacher. Although Alvin’s “step-father” directed this ten year old child to re-enter the school grounds after dismissal, unsupervised and without permission from any school authority, the trial court attributed to him no fault. Under the circumstances which followed, plaintiff has failed to show that the school did not exercise reasonable supervision.
Furthermore, had we found the school’s procedures inadequate, we must also find a causal connection between the inadequate procedures and the injury in order to conclude that the school board is liable. In accepting Koray’s version of the incident and therefore dismissing the suit against his mother, the trial court rejected plaintiffs version. This finding rendered any question regarding the lack of supervision in the cafeteria immaterial, since Koray’s account places the start of the fight in the breezeway.
In ruling on this matter two years after the trial, the trial court offered reasons for judgment which do not comport with the facts and awarded damages which were grossly excessive with regard to the injuries sustained-. This judgment is clearly wrong.
For the foregoing reasons, the judgment of the trial court is reversed.
Reversed.
JONES, J., dissents with written reasons.

. Although Harris was identified by Alvin as his "step-father,” he was not in fact married to Mary M. Hickingbottom.

. The judge found that there was no evidence whatsoever on the part of Alvin to support the defendant's claim of comparative negligence. On the issue of the negligence of the school principal, Alexander Brumfield, he noted that no evidence was presented.